(161 App. Div. 154)

### ECKERT v. PAGE et al.

(Supreme Court, Appellate Division, First Department. March 6, 1914.)

1. **WILLS (§ 324*)—CONTEST—QUESTIONS FOR JURY.**
   Questions of fact in will contests are to be determined the same as in other actions, and if different inferences may fairly be drawn from the testimony, the question should be submitted to the jury.
   [Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 225, 767–770; Dec. Dig. § 324.*]

2. **WILLS (§ 386*)—REVIEW—FINDINGS.**
   The Appellate Court will not hesitate to set aside a finding by the jury of undue influence in the execution of a will, where there is no satisfactory evidence to sustain it.
   [Ed. Note.—For other cases, see Wills, Cent. Dig. § 859; Dec. Dig. § 386.*]

3. **WILLS (§ 163*)—UNDUE INFLUENCE—BURDEN OF PROOF.**
   The burden of proving undue influence in the execution of a will is upon the party who asserts it.
   [Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 388–402; Dec. Dig. § 163.*]

4. **WILLS (§ 166*)—UNDUE INFLUENCE—EVIDENCE.**
   While undue influence in the execution of a will is seldom susceptible of direct proof, nevertheless there must be affirmative evidence of the facts from which such influence can fairly and reasonably be inferred.
   [Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 421–437; Dec. Dig. § 166.*]

5. **WILLS (§ 166*)—UNDUE INFLUENCE—SUFFICIENCY OF EVIDENCE.**
   Evidence in a will contest *held* to sustain a finding that the will was procured by undue influence.
   [Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 421–437; Dec. Dig. § 166.*]

6. **WILLS (§ 166*)—UNDUE INFLUENCE—EVIDENCE.**
   Where the disposition made by a will is unnatural, less evidence is required to establish undue influence, in the absence of evidence showing the reason of such unnatural disposition.
   [Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 421–437; Dec. Dig. § 166.*]

Appeal from Trial Term, New York County.

Action to set aside the probate of the will of Thomas T. Eckert, deceased, brought by James Clendenin Eckert against Richard G. Page

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

and another, executors, and others. From a judgment for plaintiff, defendants appeal. Affirmed.

See, also, 156 App. Div. 935, 141 N. Y. Supp. 1117.

Argued before INGRAHAM, P. J., and McLAUGHLIN, LAUGHLIN, SCOTT, and HOTCHKISS, JJ.

De Lancey Nicoll, of New York City, for appellants executors and trustees.

Ronald K. Brown, of New York City, for appellant guardian ad litem.

Charles E. Rushmore, of New York City, for respondent.

McLAUGHLIN, J. This action was brought pursuant to section 2653a of the Code of Civil Procedure to set aside the probate of the will of Thomas Thompson Eckert, deceased, upon the ground that it was not properly executed, was the result of undue influence, and that the testator did not have testamentary capacity. The trial court withdrew from the consideration of the jury the execution and testamentary capacity, and submitted only the question of undue influence. A verdict was rendered in favor of the plaintiff, setting aside the probate, and from the judgment entered thereon declaring the will invalid two of the executors and trustees named therein, one of them individually, and a legatee represented by a guardian ad litem, appeal. They contend that the judgment is erroneous because there was not sufficient evidence to justify a submission of the question of undue influence to the jury, and if there were, the verdict is against the weight of evidence.

[1-4] Questions of fact arising in actions brought to test the validity of wills are to be determined in precisely the same way as are questions of fact in other actions. If different inferences may fairly and reasonably be drawn from the testimony or evidence, then the facts must be determined by the jury. Hagan v. Sone, 174 N. Y. 317, 66 N. E. 973. But the court proceeds with great caution in setting aside the probate of a will on the ground of undue influence. It requires that fact to be established by satisfactory evidence, and, if it is not, then it never hesitates to set aside the finding of a jury to the contrary. Gardiner v. Gardiner, 34 N. Y. 155; Children's Aid Society v. Loveridge, 70 N. Y. 387; Smith v. Keller, 205 N. Y. 39, 98 N. E. 214. The burden of proving undue influence is upon the party who asserts it; and, while it is seldom susceptible of direct proof, nevertheless, in each case, there must be affirmative evidence of the facts from which such influence can fairly and reasonably be inferred. Hagan v. Sone, supra; Matter of Budlong, 126 N. Y. 423, 27 N. E. 945; Rollwagen v. Rollwagen, 63 N. Y. 504; Delafield v. Parish, 25 N. Y. 95.

[5] Keeping these rules in mind, let us briefly consider some of the evidence for the purpose of ascertaining (a) whether the jury were justified in drawing an inference that the will under consideration was the result of undue influence, and (b) whether its finding to that effect were sufficiently sustained by the evidence.

The testator died on the 20th of October, 1910, then in his ninety-third year, leaving him surviving as his only heirs at law and next of

kin two sons, the plaintiff, 56 years of age, and the defendant Thomas T. Eckert, Jr., 53 years of age. He made the will which is the subject of this controversy on the 30th of the preceding August, and it disposed of an estate of the conceded value of at least $1,650,000. By it he gave to the plaintiff's daughter real property of the value of $30,000, provided she lived to be 25 years of age, and if she died prior to that time the same to her issue; in default of issue, then the property was to become a part of his residuary estate. To his brother William and two nieces $5,000 each. To his son Clendenin, the plaintiff, $50,000 outright, and a life estate in $100,000, with remainder to his children. To his other son Thomas, the residuary legatee, the balance of his estate of the value of at least $1,470,000. The twelfth clause of his will was to the effect that if any beneficiary, either directly or indirectly, contested the validity of his will, or any part thereof, he thereby forfeited all benefits to be received thereunder. He appointed as his executors and trustees his two sons and his secretary, the defendant Page.

[6] The will, so far as the two sons are concerned, is an unnatural one, and, in the absence of proof showing why one is so much more favored than the other, less evidence is required to establish undue influence. The testator, for several years prior to his death, had two residences, one in the city of New York, and a summer residence at Elberon, N. J. The will in question was executed at the latter place. The son Thomas, unmarried, had lived with and been supported by his father since about 1890. The son Clendenin married quite early in life, and from that time did not live with the testator, and, at the time the will was executed, was living in Chicago. Notwithstanding the plaintiff had for several years lived apart from the testator, he and his family frequently visited him, and all the evidence tends to show, certainly until within a very few months prior to the execution of the will, that the testator had the same affection and regard for one son that he did for the other; that when he made a gift to one he usually made a substantially similar gift to the other; that when the plaintiff entered business, at or about the time he was married, his father loaned him several thousand dollars, and when the loan was paid, he immediately divided it between the two sons; that as late as December, 1909, Clendenin borrowed from his father $1,000, and when, a few days later, he repaid the same, the testator sent him a check for $500 as a Christmas present; and that Page actually prepared a draft will shortly prior to the execution of the one in question, in which both sons were treated substantially alike. The circumstances surrounding the execution of the will were, to say the least, very suspicious. Page left Elberon on August 29th, in company with the son Thomas for New York. When they arrived they separated, Thomas going to the New York residence, where he instructed one Thom, an employé, and who subsequently witnessed the execution of the will to take an early train the next morning for Elberon, which he did. Page went to the office of the attorney who drew the will. The following morning Page, Thomas, and the attorney went to Elberon together. The attorney had with him the will, ready for signature. When they

arrived they were met at the station by the testator's carriage and taken to his house. When they entered the library Thomas introduced his father to the attorney, whom he had never met before. Lunch was then served, immediately following which Thomas, Page, the attorney, and the testator returned to the library. Thomas then retired, and as soon as he had done so the attorney produced the will for execution, and the testator told Page to read it, which, according to the attorney's testimony, he did "in an ordinary tone." After it had been read, the testator expressed his satisfaction with it, and the attorney then volunteered to become one of the witnesses, and suggested to the testator he better have two others. Thereupon Page said, "General, shall I get James Miles and John Thom," to which the testator responded, "Yes"; Page then stepped into the hall and met Thomas, to whom he said, "Your father wants Thom and Miles; send them to the library." There were several servants in the house at the time, including the testator's nurse, and much nearer to the library than were Thom and Miles. Thomas immediately went to the place where Thom and Miles were, and said to them, according to their testimony, "Father wants you to come to the library to witness his will." When they arrived at the library door, Thomas showed them in. While the will was being executed Thomas called to his father through the window to hurry up; that the attorney had to catch a train to New York. After the execution the attorney took the will away with him, and a few days later gave it to Page, who put it in a safe deposit box, without giving any notice of its existence to the plaintiff until after testator's death. Three days after the will was executed the testator fell in his bedroom and sustained a shock from which he never recovered, and which practically confined him to his bed until he died, about seven weeks later. He became semiconscious on the 12th of October, and never regained consciousness after the 14th. After his injury Page frequently wrote the plaintiff, and his letters spoke very encouragingly of the testator's condition. In a letter written September 25th he stated that the testator "sat up for a short time every day or two," and on the 14th of October, while the testator was unconscious, he wrote plaintiff, saying, among other things, "To-day he has again considerably improved, and so it has been for some time." The plaintiff learned the real condition of his father from Dr. Bates, and at once left Chicago for Elberon, reaching there about the 15th of October. When he arrived his father was unconscious, and remained so until he died. The testator had a brother residing in New York and a niece in Connecticut, but the fact of his serious illness was not even communicated to them. When the will was executed and for several weeks prior thereto, the only relative of the testator who saw him was the son Thomas. During that time the inmates of the house were Thomas, Page, and his family, and several servants, including a Miss Egan, to whom Thomas was married about two months after the testator's death. Page and his family never resided with the testator until a few weeks before the will was made. Two or three days before the death of the testator, and while he was unconscious, Page took from his key ring, the key to a safe deposit box in which was kept the jewel-

ry of the testator's late wife, and had the box, with the jewelry, transferred to Miss Egan, and then delivered the key to her. This jewelry was of the value of at least $25,000, and the testator's wife had expressed a wish that some of it be given to the church. Thomas was not on friendly terms with his brother or with any of the relatives of the testator; on the contrary had a personal dislike for them, as evidenced by his letter to his brother dated August 11, 1910, in which he said:

"Dear Sir: * * * After I have settled all I owe you, we will be as strangers absolutely, for all time, and as for me, I do not care to see either you or any of your family."

And his letter to a daughter of the testator's brother, dated September 5, 1910, in which he stated:

"Your family have been a bunch of parasites, your father included, bleeding my father of every cent they could get out of him for years, and I shall take a hand now and put a stop to it and in answer to your request I want to say that not only will I not give the help you ask for, but I shall see to it with all the power I have there shall be no more."

Substantially all of the foregoing facts were undisputed. In addition thereto plaintiff produced evidence from which the jury could find when the will was executed the testator was in a very weak condition, both physically and mentally. That he was quite deaf, and at times unable to understand or remember what was said to him; that he spoke disconnectedly, and would fall asleep while conversing; that he had to be dressed and undressed, and when put to bed at night, would insist upon immediately getting up and being dressed, because it was morning. That he would lose his way in his own house. That he insisted upon a cat eating at the table with him, for which a place and chair were reserved. That for two years preceding the execution of the will he was constantly watched and cared for by a trained nurse. That he was easily influenced, and in many ways subservient to and controlled by his son Thomas. That Thomas spoke in a derogatory manner of the plaintiff to the testator at different times, saying that plaintiff was in get rich quick schemes; would not pay his debts; wanted to borrow money of the testator, and other statements of like character. That three or four days before the will was made he was heard to say to the testator: "Father, Clen don't care anything about you; all he wants is money. See how he treated me. I would have been better in a Jew's hands. You know the reason he don't come here, because he won't eat at the table with Minnie," and that he had to pay $900 club dues for him. That these statements were false, but nevertheless they made an impression upon and influenced the testator. That in June, 1910, when the plaintiff visited the testator, he immediately said, "I have got no money for you," to which the son replied, "I am not asking you for any, Father." That when the attorney who supervised the execution of the will voluntarily called his attention to the fact that the creditors of plaintiff could reach the $50,000 bequest, the testator said, "That's all right; if he owes that money they ought to get it." That the plaintiff was not, at the time, in debt; so far as appears, the attorney had never been so in-

formed, and that Thomas was heard to say, before the will was executed, that he would get even with the plaintiff "some day, and I will have it all in black and white."

The jury could also have found untrue the testimony of the attorney, Page, and Thomas, to the effect that the latter did not know that the testator had executed a will until the attorney sent a copy of it after the testator's death. The attorney went from New York to Elberon in company with Thomas, by whom he was introduced to the testator. It seems quite incredible that an attorney, without ever having met the testator before, without ever having had a private consultation with him, considering his age and condition, should have permitted him to execute the will without at least mentioning the fact to the son, who was in charge of the house and the only relative present. And in this connection it is significant that he should call the testator's attention to the fact that creditors might reach the $50,000 which he was giving to the plaintiff; also that there should be inserted in the will a clause that if any beneficiary contested its probate he should thereby forfeit his interest. Plaintiff was the only one who had any personal interest in contesting the will, and the insertion of the clause must have been meant to refer to him, and yet he was named as one of the executors.

It is equally incredible that Page, the secretary of the testator, and a member of the household, on most friendly terms with Thomas, should not have mentioned the will to the latter until after the testator's death.

Thomas told Thom, one of the witnesses to the will, to go to Elberon, and there was the testimony of one witness that Thom said, before he left New York, that he was going for the purpose of witnessing a will, and the testimony of another witness that he said, after he arrived there, that he had come down to witness a will. And both he and Miles testified that Thomas said to them, "Father wants you to come to the library to witness his will." The situation so impressed Miles that he remarked to Thom, "This seems like funny business to me," to which Thom replied, "What in ―――― need you care as long as you sign what they tell you to sign."

At the conclusion of the evidence it fairly showed a testator, at and for some time prior to the execution of the will, in fit condition to be easily influenced; that the opportunity was presented for the exercise of undue influence; that the inclination existed in Thomas to exercise it; and that it was so exercised by him and those assisting him.

My conclusion is that the case was properly submitted to the jury, and the verdict is sustained by the evidence. See authorities before cited, and Tyler v. Gardner, 35 N. Y. 599; 40 Cyc. 1164.

The judgment and order appealed from, therefore, are affirmed, with costs. All concur.