Matter of Proving the Last Will and Testament of ESTHER COHEN, Deceased.

(Surrogate's Court, Bronx County, March, 1919.)

Wills — probate denied because of undue influence.

Where a woman seventy-six years of age, who had been seriously ill for several weeks next preceding the execution of a document purporting to be her last will, by which she bequeathed her estate to strangers to the exclusion of her grandson, her only heir at law and next of kin, died in less than seventeen days thereafter, probate will be denied, it satisfactorily appearing that the instrument in question was the result of undue influence exercised upon the alleged testatrix by one of the legatees.

PROCEEDINGS on the probate of a will.

Joffe & Joffe, for proponent.

Arthur Mayer, for contestant.

SCHULZ, S.  The decedent died on September 29, 1918, leaving her surviving as her only heir at law and next of kin a grandson, who was the son of her only child, a daughter, also deceased. She is also

alleged to have left a last will and testament executed on September 12, 1918, in and by which she provided as follows: "After my lawful debts are paid, I give and bequeath to my friends and comforters Mr. Harry Shevitz and Mrs. Rose Shevitz, his wife, of 692 Caldwell Avenue, Borough of Bronx, City of New York, all the monies which I may have at my decease and all the personal property and bank accounts which I may then hold." The petition does not state that the decedent left any real estate, so that the provision quoted appears to dispose of all of her property. The personal property of which she died possessed is alleged to amount to $750, but the contestant throughout the hearing contended that she possessed personal property of a much larger value.

The decedent was about seventy-six years of age at the time the disputed document is alleged to have been executed. The contestant, her grandson, testified, and it was not contradicted, that the decedent lived with his mother and father, that is to say, with her daughter and her son-in-law, and their two sons, of whom the contestant was one, up to the time of the death of his father, in 1895. The family, including the decedent, then went boarding until the remarriage of her daughter, whereupon the family again went to housekeeping and so continued until the year 1907. In the meanwhile, her daughter had died, and after the year 1907 the family consisted of the decedent, the contestant, and his brother. They continued to reside together for about four years. Thereafter, the brother of the contestant having died the decedent and the contestant, the sole survivors of the family, went boarding together. Upon the marriage of the contestant in 1915, or a short time thereafter, the decedent came to live with him and his wife, and stayed there up to in or about the month of August, 1917.

During the time that this family relationship con-

tinued, the decedent occasionally left the home or the place where they were boarding and stayed away for some time, on one or two occasions going to the Home for the Aged and Infirm Hebrews, and on one occasion visiting a sister in the west with whom she intended to remain. After being in the west for a short time, however, she requested her grandson, the contestant, to call for her, which he did.

While the decedent was living with the contestant and his wife, one Harry Shevitz was employed by a butcher with whom the contestant's wife dealt, and as such employee, delivered goods and collected bills at the apartment where the contestant, his wife, and the decedent lived. In August, 1917, the contestant's wife then being in a delicate condition, it was suggested that the decedent go boarding until her condition changed which it was anticipated would be the case about a month thereafter. The uncontradicted testimony is that the decedent then went to the employer of Shevitz and asked him if he would like to take her to board, and that Shevitz, hearing the conversation, stated that he would take her. She thereupon went to board with Harry Shevitz and his wife and remained there to the day of her death.

The document now offered for probate as her will is alleged to have been made in the home of Harry Shevitz where she was then boarding, and which consisted of three rooms in an apartment house. There were present when the paper is stated to have been signed the two attesting witnesses Harry Shevitz and Rose Shevitz, named as the only legatees, and the scrivener of the will. The latter was a clerk in a lawyer's office, but it does not appear from the testimony whether he himself was an attorney at law or not. The witnesses were summoned by Mrs. Shevitz and were neighbors and friends of hers.

From the evidence I reach the conclusion that the

factum of the will has been established, and I am also of the opinion and find that the decedent at the time of her death was competent to execute a last will and testament.   There remains for consideration the final objection, however, that the will was obtained by fraud and undue influence.   I find no evidence of fraud so that it only remains to be determined whether or not the paper was the free and voluntary act of the decedent, or whether it was procured by undue influence operating upon her.   Upon that issue, the burden of proof is upon the contestant.  *Matter of Kindberg,* 207 N. Y. 220; *Matter of Martin,* 98 id. 193, 196.   This does not mean that undue influence must necessarily be proved by direct evidence.  *Matter of Richardson,* 137 App. Div. 103.   If that were necessary it would be most difficult, if not impossible, ever to prove that undue influence was exercised, and while it is true that mere opportunity to exercise it is not sufficient proof that it was exercised (*Post* v. *Mason,* 91 N. Y. 539; *Cudney* v. *Cudney,* 68 id. 148) nevertheless the evidence with which the existence of undue influence is established, must of necessity be, to a large extent, circumstantial.  *Children's Aid Society* v. *Loveridge,* 70 N. Y. 387, 395; *Eckert* v. *Page,* 161 App. Div. 154. There is no dispute that this decedent was an aged woman, and that at the time that this document was signed, she had been seriously ill for a period of about two weeks, and that seventeen days thereafter she died. It may therefore fairly be said that it was a " death bed will."   This raises no presumption against its validity (*Matter of Seagrist,* 1 App. Div. 615, 620), but it should lead to a more careful scrutiny than if executed by a person in full possession of bodily health and vigor and engaged in the normal pursuits of daily life.  *Matter of McGraw,* 9 App. Div. 372, 380; *Rollwagen* v. *Rollwagen,* 63 N. Y. 504, 518.   The evidence also warrants the conclusion that notwithstanding the

Surrogate's Court, Bronx County, March, 1919. [Vol. 106.

fact that the decedent occasionally left her grandson, he was her only living descendant; she had lived with him or in the family of which he formed a part the greater part of her life and practically all of his, and he was the natural object of her bounty. The legatees mentioned in the will are not related to her in any way, and during the time that she resided with them, she paid them for her board and lodging. She had lived with them for a period of about one year when this document was signed, by which she left everything to them, without even mentioning or in any way referring to any of her other relatives. Any one of these facts standing alone, of course, does not warrant the conclusion that undue influence was used, but they are of importance when considered together and in connection with the testimony of several of the witnesses to whom I shall hereafter refer. The mental condition of the testator is always important upon the issue of undue influence, as is also her age and her physical condition. It is apparent without discussion that the amount of influence which constitutes undue influence, that is to say, which substitutes for the will of the testator the wishes and desires of the person or persons exercising the influence, varies with the mental and physical strength of the testator. This has been recognized over and over again by courts before whom the question has come. One of the witnesses (Schuldenfrei) without objection testified that the decedent was very sick and weak, and that on one occasion a letter came addressed to some one else in the house, and she got it and refused to give it up, claiming that it was from the contestant who, she said, was in the army. The physician who attended the decedent, and who was the family physician of the Shevitz family, states that she died of arterio sclerosis and chronic intestinal nephritis, which he explained is old age, or, as he testified, her life had come to a natural end. He

said her eyesight was good but she was deaf, and that for four weeks before her death she was in bed most of the time; that she was normal for a person of her age, but he stated it to be his opinion that the condition of the mind at seventy-five or seventy-six is naturally weakened, that people of that age have weakened minds, and he stated that such was her mental condition during September.

Several neighbors, who lived on the same floor as the Shevitz family, were called as witnesses. One of these (Schuldenfrei) testified to the fact that Harry Shevitz and his wife continually urged the decedent to make a will; that Shevitz stated that the decedent asked him to send for her own doctor and that he refused; that the decedent complained about the way they treated her, and offered the witness five dollars more if she would take her in; and that Shevitz said he would not let any one have her because she has got money and he would like to have it. Another witness (Gerstein) also a neighbor living on the same floor, told of an occasion when the decedent wished some other neighbor on the floor to take her in to board, and that upon that occasion Shevitz swore at the decedent and called her ugly names, and that the decedent then said that all that he wanted was to get her money.

The employer of Shevitz at the time that he took the decedent to board with him (Hiestein) testified that Shevitz told him that he wanted the decedent to make a will, but that she never would make it, and that this took place in February, 1918.

The testimony of these witnesses with reference to statements made by Harry Shevitz were not contradicted by him, and no interest on their part in the controversy has been shown. They were all acquaintances and neighbors, if not friends, of Harry Shevitz and his wife. The two attesting witnesses testified that they had heard no loud talking between Mr. Shevitz and

Mrs. Cohen, but the witness corroborated the testimony of the two witnesses of the contestants to the effect that the testatrix did want to move out of Shevitz's apartment into some other neighbor's rooms.

The wife of the contestant testified that in the month of February, 1918, while Shevitz was at her house collecting a bill, she asked him whether he knew anything about her grandmother, the decedent; that he said he would look it up and let her know; that he met her again a few weeks later and said that he did not know anything about her, and that she told him that they intended to go boarding at the home of a Mr. Glass and that if he found out anything to let Glass know. This testimony was not contradicted and was in fact, to some extent, corroborated by Mr. Glass, who said that Mr. Shevitz met him in October, 1918, and told him that he was looking for the contestant to let him know that his grandmother had died.

In addition to this, various exhibits were offered in evidence, several consisting of letters that were written by the decedent to the contestant while she was with her sister in Chicago and desiring to return to New York and in which she requested her grandson to call for her. These letters are dated in May and June, 1917. In one of these letters dated May twenty-ninth she states that she wants to leave all her money and valuable things to the contestant. And again, in a letter written about that time, she states that she wishes to leave all her money to him.

These letters are competent and were received as declarations of the decedent to be considered upon the question of her mental strength (*Matter of Forster,* 105 Misc. Rep. 24, and cases cited), because " the amount of undue influence, which will be sufficient to invalidate a will, must, of course, vary with the strength or weakness of the mind of the testator " (*Waterman* v. *Whitney,* 11 N. Y. 157, 165, quoting

1 Jarman on Wills, 36), and hence they may properly be considered in the instant case where the issue is one of undue influence. *Smith* v. *Keller*, 205 N. Y. 39. As against this testimony there is the testimony of the superintendent of the home where the decedent was in 1915, to the effect that the decedent told her that she could not get along with her grandson; that her grandson was always complaining and her grandson did not care for her; and also the testimony of one of the inmates to the effect that she told her that her grandson would not get anything. These conversations took place in or about the year 1915, two years before the will was made, and I consider them of very little importance upon the question of the relations existing between the decedent and her grandson at the time that the will was made, particularly as the decedent had gone back to live with the grandson between the time of the conversations and the time when the document in question was executed. The other witnesses for the proponent were all intimate personal friends of the proponent. One of them (Simon) testified that the decedent told her on July 4, 1918, that her grandson did not treat her right. The other two witnesses (Soloff) testified to two occasions upon one of which she stated she wanted to send for a lawyer and draw a will in favor of Mr. and Mrs. Shevitz, because they had been treating her well and she would like to leave everything to them, and another conversation a week before she died in which she told one of the witnesses that she had made a will to Mr. and Mrs. Shevitz.

This is a summary of the testimony in the case. It leads me to the conclusion that the propounded document does not express the free and unrestrained wish of this testatrix. I think the burden which was upon the contestant has been sustained by him and that a finding is warranted that the instrument in question

Municipal Court of New York, March, 1919. [Vol. 106.

is the result of undue influence exercised upon the decedent by Harry Shevitz, one of the legatees.

It follows that probate must be denied.

**Probate denied.**