JOSEPHINE S. BURKE, Respondent, v. JAMES H. BURKE and
Others, Appellants.

First Department, November 12, 1920.

**Wills — evidence not establishing lack of testamentary capacity —
new trial.**

Appeal from a special verdict of a jury which adjudged that a certain writ-
ing was not the last will and testament of a decedent. The issue con-
cerns the testamentary capacity of the testator who is claimed to have
been suffering from mental derangement caused by excessive use of liquor,
there being proof to the contrary showing that he suffered from other ail-
ments and was of sound mind when he directed the drawing of and exe-
cuted his will. The will itself left property to the widow in lieu of dower
and gave the remainder of the property to the testator's children by a
prior marriage, but it appeared that on the day the will was executed the
testator was served with a summons returnable before a Magistrate's Court
on a charge of non-support made by his wife and that she had previously

commenced an action at law charging the testator with intoxication, the use of vile language and threatened violence.

On all the evidence, *held*, that the verdict was against the evidence and the weight of the evidence, and that the judgment should be reversed and a new trial granted.

Appeal by the defendants, James H. Burke and others, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of Bronx on the 24th day of January, 1919, upon a special verdict of a jury adjudging that a certain paper writing dated December 15, 1913, purporting to be the last will and testament of James J. Burke, deceased, is not such last will and testament, and also from an order entered in said clerk's office on the 19th day of February, 1919, denying defendants' motion to set aside the verdict and for a new trial made upon the minutes.

*Sol. A. Hyman* of counsel [*Baker & Hyman*, attorneys], for the appellants.

*George Gordon Battle* of counsel [*Lanman Crosby* with him on the brief], *O'Gorman, Battle & Vandiver*, attorneys, for the respondent.

Greenbaum, J.:

The decedent was at the time of his death, which occurred on February 4, 1914, forty-nine years and seven months of age. During his lifetime he was engaged in the manufacture of neckties at 425 East One Hundred and Forty-first street, where he also lived at the time of his death.

He left him surviving the plaintiff, his widow, and three daughters, the defendants Marie Welsh, Florence Flemming and Virginia Burke, his only heirs at law and next of kin. His father, the defendant James H. Burke, also survived him. The deceased was married to the plaintiff, his second wife, in September, 1912, his first wife having died in 1907.

Under the instrument above mentioned he bequeathed to his daughters Florence Flemming and Virginia Burke, each the sum of $100 and gave to the plaintiff the income derived from one-third of the real estate in lieu of her dower rights. All the rest, residue and remainder of the estate he devised and bequeathed to his daughter Marie Welsh, wife of David R.

Welsh, requesting his daughter to maintain and provide a home out of the proceeds of the estate for his father and mother and that his daughter Marie Welsh should minister to the wants of her sisters Florence Flemming and Virginia Burke should they require medical attention or board and lodging. He appointed David R. Welsh, husband of his daughter Marie, as his executor.

The evidence on behalf of the contestants was to the effect that in June, 1913, decedent had an attack of typhoid fever; that after his illness he went to the Berkshires and then to the Catskills, returning to his home 2390 Amsterdam avenue, New York, about September fifteenth, where he was then living with the plaintiff; that he stated to various persons he had miserable treatment in the Catskills and that if he had had a gun he would have shot himself and that he further stated that " people " had put ground glass in his food at the Catskills; that he wept in speaking of these matters; that he said that he had terrible pains in his head and side and that negroes were after him and chasing him; that he told his wife's sister that his daughter Marie Welsh was trying to poison him; that he would not eat anything at the last-named address since he was afraid of the food; that he told his wife that some one in the room was fighting him and that there were people looking at him; that he saw pictures on the wall which did not exist; that when told he was mistaken about the things which he stated he saw, he cursed and swore and said that they were telling him a lie and fell back exhausted in bed; that on or about the 28th day of November, 1913, Thanksgiving day, he left his home, which was then 960 East One Hundred and Seventy-ninth street, to which place he had moved from his Amsterdam avenue house, and thereafter he lived with his father, James H. Burke, at 425 East One Hundred and Forty-first street, which was his place of business; that during this period he was violent and abusive; that while reading the newspapers he made profane comments upon what he read, and cursed and swore. It was also testified that he was a man who drank alcoholic beverages frequently and on some occasions was intoxicated.

On the part of the defendants the testimony was that he attended to his business quite regularly and personally attended

to details such as drawing checks and doing the cutting of the goods from which the neckties were made and generally supervised his business as had always been his custom; that during the last months of his life there were no indications of any delusions on his part or any acts which betrayed any lack of mentality. There was also testimony given on the part of a physician who attended him during the latter days of his life, who testified that the deceased was suffering from Bright's disease, chronic catarrh of the stomach and intestines and a valvular heart but that he had no condition of arterio sclerosis; that deceased called at his office about once a week until about the middle of November, 1913, and he talked to him on these occasions and prescribed for him; that he thereafter attended upon the deceased about once or twice a week, but never was told by him that he was pursued by colored people or saw imaginary things or that people were trying to annoy him; and that the cause of his death was uremic coma into which he went twenty-four hours before his death.

An attorney of this court who had known the deceased for about thirteen years up to the day of his death testified as to the circumstances attending the execution of the will. According to this testimony he called upon the deceased as a result of the latter's request made to one Lloyd, an intimate friend, to procure a lawyer as he desired to make a will. This attorney testified that the instructions which he received as to making the will were given directly to him by the deceased with whom he spent about two hours in his room without anybody else being present until the instrument was ready for execution; that he had never received any directions from anybody else as to the making of the will. The attorney testified that after he received instructions he stated to the deceased that he would go down to his office and have the will typewritten, but the deceased told him to " Do it right now. I am sore." After the lawyer had written out the will two witnesses were called from one of the other rooms in the house. The attorney testified that the deceased particularly referred to his daughter Marie Welsh, who he said had helped him in his business for many years up to the time of his death. He also spoke about his other two daughters to whom he bequeathed $100 each and stated his reasons for discriminating

against them, and also about his wife. It also appears that on the very day that the alleged will was made the deceased was served with a summons returnable before a Magistrate's Court on the seventeenth day of December on a charge of non-support made by his wife, the plaintiff.

The testimony in behalf of the defendant tended to show that the deceased was not an habitual drunkard, although he was in the habit of drinking alcoholic liquors. Upon the testimony of the plaintiff's witnesses a hypothetical question was framed which was propounded to a physician who was admittedly an expert in mental disorders. This witness, who had never seen the deceased and had merely testified upon the assumed state of facts embodied in the hypothetical question, gave his opinion that upon the assumed facts the deceased suffered from a well-recognized form of brain disease known as psychosis, associated with a chronic disease of the heart and kidneys, in which the delicate nerve centers are often so poisoned that a man's actions are not those of a sane human being and that the person so afflicted is at times very suspicious, with delusions of persecution and not infrequently accompanied by a desire to commit suicide; that his will power was weakened by kidney and heart diseases to a marked degree and he was usually more susceptible to the influences of people who got him into their power and control than would be a man in normal mental condition.

Plaintiff's alienist testified upon cross-examination that his answer as to the mental condition of the deceased whom he had never seen in his lifetime would be different if the fact were that the deceased did not drink to excess; and he was asked if it appeared that he was not a chronic drunkard whether that would make a considerable difference in his brain. The witness responded in the affirmative. As a matter of fact there was no evidence disclosing that the deceased was a " chronic alcoholic." It is not seriously disputed on the part of the defendant that the deceased attended to his work quite regularly during the latter part of his life.

In *Matter of Heaton* (224 N. Y. 22) it is stated: " Habitual and extreme intoxication is not in and of itself evidence of or does not constitute an unsound mind or testamentary incapacity. There must be the additional proof that at the

time of the testamentary disposition the natural intelligence, memory and judgment were paralyzed or perverted or the power of volition inactive because of the intoxication. (*Peck* v. *Cary*, 27 N. Y. 9; *Van Wyck* v. *Brasher*, 81 N. Y. 260.) Such proof is wholly lacking. Testimony of the grossly intemperate habit of the deceased has weight, under the evidence here, only as proof of one fact among others useful in reaching a true understanding in regard to her ability to make the efforts of the mind and memory requisite to have and carry out a sound choice or wish in the disposition of her property. The holding of delusions does not in and of itself constitute testamentary incapacity. There may co-exist delusion and a disposing mind. A delusion affects testamentary capacity only when it enters into or controls in some degree its exercise. (*Dobie* v. *Armstrong*, 160 N. Y. 584; *Middleditch* v. *Williams*, 45 N. J. Eq. 726; *Shreiner* v. *Shreiner*, 178 Penn. St. 57.) Giving the evidence of the contestants its fullest legitimate vigor and effect, it falls far short of proving that Mrs. Heaton held any delusion which to any extent influenced her in executing the propounded instrument. It does not tend to prove that any delusion at any time entered into or influenced her conduct or action. We do not discover in this record any evidence that intemperance and disease had so impaired or denatured the mind of Mrs. Heaton that she was incapable, when not drunk, of knowing the extent and value of her property, of knowing her relatives and all the relations between them, and of having a fixed wish and a judgment in the disposition of her property; or had so impoverished her memory that she could not collect in her mind, without prompting, the particulars or elements of the business to be transacted, and to hold them in her mind a sufficient length of time to perceive, at least, their obvious relations to each other. A person who has sufficient mental power to do those things is, within the meaning and intent of the law, of sound mind and competent to dispose of his estate by will. (*Delafield* v. *Parish*, 25 N. Y. 9; *Matter of Will of Snelling*, 136 N. Y. 515.)"

This excerpt from the opinion in the *Heaton Case* (*supra*) applies with peculiar force to the facts disclosed upon the instant proceeding. There was not the slightest evidence in

the case tending to show that at the time of the making of the will the deceased was under the influence of intoxicating liquor or that he was then subject to delusions, nor indeed was there any evidence which would bear upon the question of mental aberration or abnormality at that time.

As bearing upon the matter of delusion it is to be observed, that notwithstanding the inference sought to be drawn from the testimony submitted in behalf of the plaintiff, that the deceased told her that his daughter Marie was trying to poison him, he, nevertheless, spent the last months of his life in her company.

With respect to the claim that the deceased was unduly influenced by Marie R. Welsh, her husband, and her grandfather (the father of the deceased) it is sufficient to state that there was but slight evidence which would tend to show that any such undue influence was exerted.

As already mentioned, on the very day when the deceased executed his alleged will he was served with papers in a proceeding in the Magistrate's Court brought by his wife in which he was charged with non-support. It also appears that an action at law was commenced in the Supreme Court by the plaintiff against the deceased on January 5, 1914, in which she alleged in her complaint that he was intoxicated and used vile and abusive language and threatened to strike her ever since the 1st of December, 1912. That circumstance throws some light upon the relations which existed between plaintiff and her husband at the time that he left her. The parties had been married but a very short time. The will of the deceased discriminated with apparent good judgment as to two of his children and there was nothing extreme in his selecting his daughter Marie as the principal beneficiary. She evidently was the mainstay of the family and most loyal to her father's and grandfather's interests. The circumstance that in his will he only left his wife what she was legally entitled to, is of no special significance, excepting to show that he had her in mind when he made his will. He had a perfect right to make such a will and the only question is whether he comprehended what he was doing and whether his acts at the time of making his will indicate that he had legal capacity to make it.

It will be appropriate in this connection to quote from

the opinion of the court in *Smith* v. *Keller* (205 N. Y. 39, 44): "A person has the right to use any reasonable and legitimate argument to induce another to make a will in a particular way. The giving of advice and the use of argument and persuasion do not constitute ground for avoiding a will made by a competent testatrix even if the will is made in conformity with the advice so given. A will cannot be avoided because of the influence of another, unless it appears that the influence exerted was so potent at the time the will was made as to take away and overcome the power of the testatrix at that time to act freely and upon her own volition. The influence of another to avoid a will must amount to coercion and duress."

It may also be appropriate to quote from *Eckert* v. *Page* (161 App. Div. 154, 155): " But the court proceeds with great caution in setting aside the probate of a will on the ground of undue influence. It requires that fact to be established by satisfactory evidence, and if it is not, then it never hesitates to set aside the finding of a jury to the contrary. (*Gardiner* v. *Gardiner*, 34 N. Y. 155; *Children's Aid Society* v. *Loveridge*, 70 id. 387; *Smith* v. *Keller*, 205 id. 39.) The burden of proving undue influence is upon the party who asserts it, and while it is seldom susceptible of direct proof, nevertheless in each case there must be affirmative evidence of the facts from which such influence can fairly and reasonably be inferred. [*Hagan* v. *Sone*, 174 N. Y. 317; *Matter of Budlong*, 126 id. 423; *Rollwagen* v. *Rollwagen*, 63 id. 504; *Delafield* v. *Parish*, 25 id. 95.]"

In my opinion the verdict of the jury should have been set aside, as against the evidence and as against the weight of the evidence. The judgment and order appealed from must be reversed and a new trial directed, with costs to appellants to abide the event.

CLARKE, P. J., LAUGHLIN, DOWLING and SMITH, JJ., concur.

Judgment and order reversed and a new trial ordered, with costs to appellants to abide event.