In the Matter of the Probate of the Will of WILLIAM H. MORRISON, Deceased.

FREDERICK L. CHAPMAN, as Executor of the Will of WILLIAM H. MORRISON, Deceased, Appellant; PALMER B. MORRISON et al., Respondents.

First Department, March 8, 1946.

*John W. Kelly* of counsel (*Woolsey A. Shepard* with him on the brief; *Wise, Shepard, Houghton & Kelly*, attorneys), for appellant.

*Frederick C. McLaughlin* of counsel (*McLaughlin, Russell & Bullock*, attorneys), for Palmer Bennett Morrison, respondent.

*Joseph A. Cox* of counsel (*Joseph T. Arenson* with him on the brief), attorney for the Public Administrator of the County of New York, respondent.

COHN, J. This contested probate proceeding was tried before a surrogate without a jury. The proponent is Frederick L. Chapman, who was named executor in the will.

Objections to the probate were filed by Palmer Bennett Morrison, brother and sole distributee of the decedent and by the Public Administrator of the County of New York. The objections raised issues involving the testamentary capacity of decedent and a claim of fraud and undue influence allegedly practiced upon him by the proponent and one of decedent's two stepsons.

Under the propounded writing, decedent's brother was to receive the income of the residuary estate, which was placed in trust for that purpose, and upon his death the principal of the trust, together with accumulated income, was to be divided between Richard Lamb and William Courtney Lamb, stepchildren of decedent, or their issue. The proponent and the Lamb brothers were named trustees.

By the terms of two prior wills, executed July 28, 1943, and September 10, 1943, respectively, all of decedent's property was devised and bequeathed to his brother, Palmer Bennett Morrison, who was designated as executor in each of these wills.

After a trial the objections were upheld, the Court ruling that the decedent lacked testamentary capacity and that fraud and undue influence had been practiced upon him. From the decree entered thereon, this appeal is taken.

The Surrogate upon conflicting evidence was called upon to decide whether the testator was of sound and disposing mind and memory when he executed the instrument offered for probate. The expression " sound and disposing mind and memory " has been frequently defined. It means that the mind of the testator " as to its thinking and judging powers at the time of executing the instrument proposed for probate must be clear enough to be capable of interfering with the disposition of the estate by a prior will with some degree of judgment and discretion " and that the testator must retain sufficient active memory to recollect " without prompting the necessary elements of the business to be transacted and to hold them a sufficient length of time to understand their relations to each other and to form some rational judgment in relation to them." (*Matter of Delmar*, 243 N. Y. 7, 14.) The manner of determining questions of fact arising in a proceeding involving the validity of a will is no different from the means of resolving issues of fact in any other case. If there be evidence tending to show incompetency to make a will and the evidence is of such a character that different inferences may fairly and reasonably be drawn therefrom, the case must be decided as one of fact. (*Hagan* v. *Sone*, 174 N. Y. 317, 323; *Matter of McCarthy*, 269 App. Div. 145, 154; *Matter of Barney*, 185 App. Div. 782, 794.)

Though the proponent presented substantial proof by reputable witnesses that the deceased was of sound and disposing mind and memory at the time of the execution of the propounded document, there was other evidence in the case from which it might fairly be inferred that the testator was not competent to make a will. The decedent, seventy-five years of age, had suf-

fered a paralytic stroke on December 31, 1943, which rendered him helpless and compelled his confinement to a hospital under restraint from that day until his death in August, 1944. On the morning of the day that the will was executed, to wit, February 18, 1944, his conduct was irrational and at the time of its execution in the afternoon, as stated in the nurse's notes contained in the hospital records, the deceased, though appearing to be rational, was mentally confused. The stroke from which he suffered affected decedent's brain and while there is evidence that he was rational for extended intervals, the mental confusion and irrational periods which followed from his infirmities were of constant and of almost daily occurrence up to the date of his death. This evidence was supplied in great measure by the hospital records and the disinterested testimony of decedent's own nurse and his physician, who were witnesses for the proponent.

The law is well settled that in a will contest the burden of proving testamentary capacity is upon the proponent. (*Rollwagen* v. *Rollwagen*, 63 N. Y. 504, 517; *Delafield* v. *Parish*, 25 N. Y. 9; *Matter of Smith*, 180 App. Div. 669.) The Surrogate's determination that on the date the propounded paper was handed to decedent for signature he was unable to comprehend the whole background of his relation to his brother and to his stepsons and that he was unable to comprehend any basis for change in his testamentary plans, in our view has sufficient basis in the record to support it.

We do not, however, accept the conclusion of the court that the propounded will was procured through undue influence and fraud of the proponent and one of the deceased's stepsons. The burden of proof upon the question of undue influence and fraud rests upon the contestants. (*Matter of Anna*, 248 N. Y. 421, 427.) This burden does not shift, but remains on the parties who assert its existence. (*Matter of Kindberg*, 207 N. Y. 220, 228–229.) The charge must be established by satisfactory affirmative evidence and may not be assumed to exist. (*Matter of Schillinger*, 258 N. Y. 186, 190, 192; *Matter of Ruef*, 180 App. Div. 203, affd. 223 N. Y. 582; *Matter of Henderson*, 253 App. Div. 140, 145; *Burke* v. *Burke*, 193 App. Div. 801, 808.)

The record, as we read it, does not establish the claim that Frederick L. Chapman, the proponent, or Richard Lamb, the stepson, practiced fraud or exercised improper influence and coercion over the decedent. In the absence of satisfactory proof, we may not assume that such a charge has been sustained by the contestants who have the burden on this issue. In our view the

evidence is insufficient to support the finding that the will propounded was procured through undue influence and fraud.

The decree should be modified by eliminating the provision therein contained " that the execution of said instrument was caused or procured by undue influence and fraud " and by eliminating the provisions taxing costs and disbursements awarded to Palmer Bennett Morrison in the sum of $981.50 against Frederick L. Chapman personally, and costs and disbursements in the sum of $547 awarded to the Public Administrator of the County of New York against Frederick L. Chapman personally. The costs and disbursements so awarded shall be payable out of the estate of decedent, without a right of recoupment against Frederick L. Chapman. As so modified the decree should be affirmed, with costs of this appeal to the appellant payable out of the estate, and the proceeding remitted to the Surrogate of the County of New York for further action in accordance with this opinion.

MARTIN, P. J. (dissenting in part). Insofar as the majority opinion reaches the conclusion that the evidence is insufficient to support the finding that the will propounded was procured through undue influence and fraud, we concur. However, we are of the opinion that the proponent clearly established the testamentary capacity of Dr. Morrison.

Dr. Morrison was about seventy-five years of age when he died on August 26, 1944. He had suffered a paralytic stroke on December 31, 1943, necessitating hospitalization until his death. In either 1935 or 1936 he had married Sarah E. Morrison. This was the second marriage for both parties. Dr. Morrison had no children but Mrs. Morrison had two sons by her previous marriage. She had a separate estate of about $25,000. Dr. Morrison left an estate of about $30,000. An understanding had been had between decedent and his second wife that their respective properties would be devoted substantially to the maintenance and support of the survivor and, on the death of the survivor would pass to the sons of Mrs. Morrison. Accordingly, they executed separate wills. The will of Mrs. Morrison left a bequest of $1,000 to each of her sons and the balance of her estate was bequeathed to her husband. Dr. Morrison made a will leaving $1,000 to his brother and the balance of his estate to his wife. When Mrs. Morrison died in March, 1943, her sons were disappointed with the provision made for them and entertained the thought of contesting their mother's will. Their stepfather was so informed. To meet

their objections he proposed making a will under which his estate would pass to them. This did not satisfy the attorneys representing the sons as such a will could be revoked. By way of compromise the residue of Mrs. Morrison's estate was placed in trust, the income to be paid to Dr. Morrison during his life and on his death the principal to pass to Mrs. Morrison's sons.

Expressing himself as being hurt that the Lamb boys (Mrs. Morrison's sons) did not have confidence in him, Dr. Morrison destroyed the proposed will under which his estate would have been given to them and in July, 1943, executed a new will under which he left everything to his brother, Palmer Bennett Morrison, one of the contestants in this proceeding. At the time the July, 1943, will was executed, there was a discussion between Dr. Morrison and his attorney as to whether Palmer Bennett Morrison had any family. In this discussion Dr. Morrison stated that his brother had been divorced and had one son with whom he was not on good terms. On being asked what would happen if his brother died before him, Dr. Morrison replied: "Oh, well, I can make another will." In response to the suggestion that the brother who was living abroad might not be able or care to come here, the decedent said he would think that over and let his attorney hear from him.

Dr. Morrison is described as being rather irascible and resentful of suggestions. In September, 1943, he talked with his attorney, stating he had been thinking over the question of an executor in the event his brother did not qualify, and inquired whether the attorney would act. The attorney said he preferred not to. Dr. Morrison then named Frederick L. Chapman whom he described as his oldest friend and who had charge of his business affairs. On September 10, 1943, a new will was executed. The only difference between the July will and the will executed in September was the naming of Frederick L. Chapman as alternate executor in the event that the testator's brother failed to qualify. Dr. Morrison's attention was again called to the possibility of his brother's predeceasing him, in which event the property would go to the brother's son, and again he said: "Well, if that happens I can always draw another will, and, anyhow, I haven't quite made up my mind what I want to do."

When Dr. Morrison suffered the paralytic stroke on December 31, 1943, he was taken to Roosevelt Hospital where he remained until his death on August 26, 1944.

Frederick L. Chapman, whom Dr. Morrison had described to his attorney as his oldest friend, visited him several times

between January 2, 1944, when he first learned of decedent's hospitalization, and February 11, 1944. Responding to a message that Dr. Morrison wished to see him, Mr. Chapman called at the hospital on February 11, 1944. His testimony as to what took place on that visit is as follows: " He [Dr. Morrison] said, ' I want to talk about my will.' I said, ' All right, fine. What is in your mind? ' He said he had been thinking over his will, and that he now felt that he would prefer to have his estate go as he had always felt it should prior to this disagreement between himself and the Lamb brothers, that is, to the Lambs themselves, Mrs. Morrison's sons by her former marriage themselves, and I said, ' Well, Doctor, if that is what you want done, I think it is something that would have made Mrs. Morrison very happy, because that is what she would have liked, and if that is what you want done, why, it is a splendid idea. Have you any ideas about it? ' He said, ' I would like my brother, Palmer Morrison, to enjoy the income from it during his life. How can we accomplish that? ' I told him in my opinion the best way was to set up his estate in trust, with a provision that his income go to his brother during his lifetime, and upon his brother's death that the trust be divided between the Lamb boys, and he said, ' Well, that is fine, that is a good idea. How do you do it? ' and I said, ' Of course, well, the best way is to have a corporate trustee do it,' well, as he had in connection with his executorship of his will. He said, ' I don't particularly want to do that. Is there any other way to do it? ' I said, ' You can appoint an individual as trustee, if you wish, or more than one individual.' We discussed this back and forth for a little time, and finally worked out that in his opinion he would like to have me as one of the trustees, and he said, ' How about having the Lamb boys as trustees? ' I said, ' It is all right with me. I am delighted to work with them, and anything you want to do that way certainly ought to be satisfactory,' and he said, ' Well, now, how can we get this done? ' I said, ' Do you want me to do anything for you on it? ' and he said, ' Yes, I wish you would.' He said, ' It is difficult for me to get in touch with the lawyer. Mr. Shepard has drawn my wills in the past. I would appreciate if you would get in touch with him and tell him what I want done, and he can draw a will and I would like to sign it.' I said, ' All right, I will be glad to do that and do it as soon as I can. How long will it be? ' He said, ' No particular hurry. I wish you would do that.' And so, after a further conversation not pertaining to the will, I left."

Mr. Chapman's testimony is that Dr. Morrison knew what he wanted on February 11, 1944, and that his conversation impressed him as rational. He testified: " I had seen Dr. Morrison three or four times prior to that, and I would say he was about as he had been several times before, and I felt he knew what he was doing, he was not sick enough not to know what he was doing."

As a result of this visit of February 11, 1944, Mr. Chapman communicated with Mr. Woolsey A. Shepard, a well known lawyer, who prepared the will now before the court under which the residue of Dr. Morrison's estate is placed in trust, the income to be paid to decedent's brother, Palmer Bennett Morrison, during his lifetime and on his death the principal is given to William Courtney Lamb and Richard Lamb, the sons of Mrs. Morrison.

The will under attack, as well as other wills of decedent, was prepared by Mr. Woolsey A. Shepard who acted as a subscribing witness. His testimony as to the execution of the will in the hospital is in part as follows: " I went in and walked up to Dr. Morrison. He smiled and greeted me, and I said, ' How are you feeling, Doctor? ' ' Well,' he said, ' I have been pretty sick, but I think I am coming along all right now,' and I said, ' Doctor, I have come up here with a will. I have drawn a new will in accordance with a letter which I got from Mr. Chapman,' and he said, ' Yes, that's right,' and I said, ' Now, I want to read it to you. I will read it slowly, and I want you to follow it carefully.' * * *. ' It ' was the will. So I did. I read it to him very slowly. It appeared to me that he followed it, and when I had finished I said, ' Now, is that the way you want it, Doctor? ' and he said, ' Yes, that is right.' Then I said — ' I think Mrs. Motley had gone to the foot of the bed, standing there waiting, and I motioned for her to come forward, and I said, ' Doctor, you remember Miss Tanner.' That, I say, is the name we call her by in the office, and he smiled and said, ' Oh, yes.' ' Now,' I said, ' Doctor, is this your last will and testament? Do you declare this to be your last will and testament? ' and he said, ' Yes,' and I said, ' Do you want Mrs. Motley and myself to witness it? ' He said — I think his words were, ' If you will, please,' and he smiled, and — let me see — I think he then asked for his glasses, which were in a little stand next to his bed there, and the nurse stepped forward and gave them to him, and then we were looking for some way for him to sign it, and the nurse put a pillow across the bed in front of him, and we rested the will on that, and I think I gave him

my fountain pen, and he said, ' Well, I don't see particularly well, Mr. Shepard. Will you show me just where to sign? ' and I put my finger on the end of that line there in front of the seal, and I said, ' You sign on that line.' He said, ' Oh, yes.' So he signed his name, and then he looked up at me and smiled and said, ' Well, that is a pretty shaky signature,' and I said, ' Well, of course, Doctor, you are sick, but it is all right. I think it can be made out.' Then Mrs. Motley and I signed as subscribing witnesses; that is, we signed first on the left-hand side, which says, ' In the presence of,' and then we signed — read the attestation clause, and signed under that. Oh, I think — I can't recall whether Mr. Chapman said to him that Dick was outside, or whether he said to Mr. Chapman, ' Will you call Dick in? ' In any event, Mr. Chapman went to the place where you enter the semiprivate room, and motioned, and a man came in, now I recall, and Mr. Chapman introduced him as Richard Lamb, and the doctor looked at him and he said, ' Dick, I have drawn a new will, and I want Mr. Shepard to read it to you,' and so I read it aloud again, and the doctor said, ' How's that, Dick? ' and I can't remember his exact words, but Mr. Lamb said something to the effect, ' Well, that is pretty fine, Dad,' and ' Thank you very much.' Then I said, ' Well, Doctor, do you want me to take this will back to my office and put it in my safe, or what shall I do with it? ' and he said, ' Well, you had better give it to Mr. Chapman,' which I did, and then I left.''

Mr. Shepard testified that in his opinion Dr. Morrison was of sound mind and was under no restraint and subject to no influence at the time of execution of the will.

The other witness to the will, Mrs. Violet G. Motley, gave testimony similar to that of Mr. Shepard as to the execution of the will and she testified that in her opinion Dr. Morrison was of sound mind and subject to no restraint or influence at the time of the execution of the will. Mr. Chapman was present at the time of the execution of the will and his testimony is corroborative of the testimony of the two subscribing witnesses.

The principal basis for the conclusion that the testator was not competent to make a will is the hospital records. The records, however, must be read in the light of the testimony of the attending physician, Dr. W. Laurence Whittemore, and the nurse, Mrs. Marion King Sirianni. Mrs. Sirianni, who made most of the entries, testified that an effort was made to high light the day's happenings so that the attending physician could judge for himself. Any unusual behavior was recorded. This did not mean that, whenever the notation was made that

the patient was rational, he was ordinarily irrational. The notation that the patient was irrational appeared frequently. Dr. Whittemore testified that when he spoke to the patient, even though he had been irrational or confused a little before, he would usually rouse himself and speak rationally. Asked what would be the subject matter of his conversations, Dr. Whittemore testified that it would be anything of the current news, perhaps about the patient himself, his shoulder or anything that happened to be uppermost in his mind at the time.

The nurse testified that the patient was especially fond of reading a newspaper in the first two or three months of his illness and, if the paper was not present in the morning, he was very much annoyed, although as a rule he simply read the headlines or topical sentences. After reading, he might mention the news items; he did not say too much as he was a man of few words, but he would show that he had a fair amount of interest in or understanding of what he read. There is also testimony that he discussed breakfast foods and was annoyed when he had to eat cereal other than that of which he was especially fond. Mrs. Sirianni testified that after Dr. Whittemore, the attending physician, would make his call, in some instances the patient would discuss his friendship with Dr. Whittemore, how long he had known him and where he had known him. It is evident that irrationality or mental confusion was not a constant condition. The record for February 13, 1944, the day when Dr. Morrison gave instructions to Mr. Chapman as to how he desired his will prepared, indicates that the patient was rational. The record for February 18, 1944, the day the will was executed, indicates mental confusion but not irrationality. There is testimony that on the morning of February 18th both the attending physician and the nurse had information that on that day it was proposed to have the patient execute papers. Apparently it was not thought that the effort involved would interfere with the progress of the patient for there appears to have been no objection on the part of either the physician or the nurse.

Mrs. Sirianni testified that after the will had been executed and the party left, she proceeded to take care of decedent. Her testimony is: '' He was crying, very much upset, completely exhausted from what for him was quite a long ordeal. He wasn't very strong; he was quite weak. * * * I asked him first, ' What are you crying about? ' and he said it was a very sad occasion, and I said, ' Why a sad occasion, Doctor? ' and he said, ' I have just signed my last will and testament,' and

I, just to divert him, laughed, and I said, ' Why should that make you sad? You should be glad you have an estate to leave,' and Dr. Morrison said, ' Well, don't you think it is always a sad occasion when a person signs a last will and testament? ' ''

At the time of this conversation, Mrs. Sirianni testified that decedent impressed her as being rational and, asked as to what her impression was at the time the decedent requested his glasses in connection with execution of the will, she said: '' it would seem that if the man realized that he needed glasses for the performing of something of that sort he would know what he was doing.''

Dr. Whittemore testified that on February 19, 1944, the day following the execution of the will, he visited Dr. Morrison and asked him if he knew what had been done and if he approved of everything that had been done and he said he was perfectly satisfied and understood what had been done.

The paralytic stroke which decedent suffered apparently had no visible effect. Mrs. Motley, one of the witnesses to the execution of the will, testified that she could not notice anything wrong with his left side although she was in the hospital room for over half an hour. The stroke produced confusion of mind but there appears to have been no permanent impairment. Dr. Whittemore testified that he did not mean to imply that decedent was generally in a state of mental confusion until he was aroused. From all of the testimony it is evident that the irrationality or mental confusion was not a constant condition. In *Matter of Winne* (50 Misc. 113, 115) it was pointed out that it is well established by medical experience that loss of mind brought on by hemorrhage of the brain is not often complete where the patient survives the attack, and is invariably transitory and recurrent. The entire record establishes that most of the time decedent was rational and understood what he was doing. The testimony as to the giving of instructions for the preparation of the will makes it clear that decedent knew what he wanted. The testimony as to the execution of the will is clear and convincing. The subscribing witnesses leave no doubt that the decedent thoroughly understood the nature of the document he was signing and its contents.

In *Matter of Coleman* (111 N. Y. 220, 227) it was said: '' The condition of the testator's mind, as evidenced by his actions, conduct and conversation at the time of making a will, is a part of the *res gestæ* of the transaction, and witnesses thereto are competent to speak thereof, and give opinions in relation

thereto, without any other knowledge thereof except that derived from his conduct on such occasions. (*Clapp* v. *Fullerton*, 34 N. Y. 190; *Holcomb* v. *Holcomb*, 95 id. 316.) "

It is important to note that the proposed will makes a natural disposition of the estate. On several occasions Dr. Morrison evidenced a desire to. provide for his brother without the possibility of the latter's son benefiting. The will does provide for the brother. The ultimate disposition of the residuary carries out Dr. Morrison's agreement with his deceased wife which agreement had been fully performed by her. If we may speculate as to the genesis of the will, it is the dictate of conscience that the deceased should fulfill the promise he made to his wife.

The test of testamentary capacity has been frequently stated. The testator must have strength and clearness of mind and memory sufficient to know in general, without prompting, the nature and extent of the property of which he is about to dispose, the nature of the act which he is about to perform, and the names and identity of the persons who are the proper objects of his bounty and his relation toward them. All of these conditions are established here. To hold otherwise would be tantamount to finding that a reputable physician, a businessman and a well-known lawyer have conspired to foist upon a helpless old man a will which benefits none of them but is in favor of legal strangers to them. The will should be .admitted to probate.

The decree appealed from should be reversed and the Surrogate directed to admit the will to probate.

GLENNON and PECK, JJ., concur with COHN, J.; MARTIN, P. J., dissents in part in an opinion in which TOWNLEY, J., concurs.

Decree modified in accordance with opinion of COHN, J., and as so modified affirmed, with costs to the appellant payable out of the estate. Settle order on notice.